ANNE A. T. C. FERLAT by her next friend,

v.

CLAUDIUS F. GOJON.

A marriage procured by abduction, terror and fraud, will be annulled by this court.

1825.
11th. March.

*Dissolution of marriage.*

THE bill in this cause was filed in the name of Antoinette Theodorine Cavin Ferlat of the city of New York, an infant, by Stephen Ferlat of the same place, her next friend. It set forth, that the complainant is of the age of about nineteen years; and her mother is now the wife of the said Stephen Ferlat, with whom the complainant lives, as one of his family, superintending a school of young ladies; the proceeds of which contribute to her support and maintenance: that on the sixth day of January 1825, the defendant with one Mary Matthieu and others, by artful contrivances, stratagems, deception and fraud which are detailed in the bill, entrapped and forced the complainant into a pretended and compulsory submission to a marriage ceremony with him; but which was had and performed, without her real consent and against her voluntary will, and without the consent of her parents or either of them, but only by an apparent consent feigned by her at the time, as the only means which she could devise for escaping from him and his confederates and the designs which she perceived they had formed; she having no parent, relative or friend present, and being surrounded only by Gojon and those in his interest; that in this situation, she was greatly alarmed and with difficulty, could preserve or assume sufficient strength to execute her design, and eventually, to escape from the plot, which had been laid: that she refused to remain in the house to which they had conveyed her, and where they had procured the said ceremony to be performed: that she left it immediately afterwards, in company with Gojon and his confederates; and as soon as she reached the house of her friend, from which she had been drawn by false pretences and representations, she forbade Gojon to enter the said house; on which he departed, and the complainant saw him no more; she having determined from the first, never to consummate or recognise the said fran-

dulent marriage : and that the said marriage has never been consummated by cohabitation or any subsequent consent. The prayer of the bill is, that the said pretended marriage between the complainant and the defendant, may be decreed fraudulent, null and of no effect ; that the complainant may be restored to her rights, as they existed before the said pretended marriage ; and that she may have such other relief as may be equitable.

1825.

FERLAT
v.
GOJON.

The defendant did not appear ; and this bill was taken as confessed against him, by default, according to the statute and upon the usual public notice.   The cause coming on, in the ordinary course of bills taken as confessed ; the court was of opinion, that it ought not to proceed to a decree, until the allegations of the bill should be investigated, and the truth of the case as it might exist in fact, should be fully presented to the court.   This course was necessary, in order to prevent collusive suits for divorces ; and it was expedient, for the information of the court, in this new case, which involved important questions concerning the powers of this court.   An order was accordingly made, that it be referred to a master, to inquire into the matters stated in the bill ; to take proofs concerning those matters ; and to report such facts as should be proved by satisfactory evidence.

15th April.

The order of reference was executed by Mr. Pell, one of the masters ; and his report stated at length, the testimony taken before him.   A summary history of the case deduced from the report, is as follows.

3d May.

In the afternoon of the sixth day of January 1825, Miss Ferlat, who kept a school of young ladies, and whose excellent character was fully proved, had called to take tea with Miss McLeod, a young lady, her pupil ; when about five o'clock, a carriage called with a message, that the Reverend Mr. Power, the priest of her church, desired her to call upon him.   After some hesitation and doubt arising from the unusual character of this message, she determined to go ; but when she arrived at Mr. Power's, he declared, that he had not sent for her ; but that Mr. Gojon was then in the house, at which she seemed surprised, and unequivocally said, that she did not wish to see Mr. Gojon.   It appeared from Mr.

Power's testimony, that Gojon had before requested Mr. Power to marry him to Miss Ferlat; which Mr. Power had refused, upon learning that he had not the consent of her relatives. Miss Ferlat now said, that she had not the least idea of marrying Mr. Gojon, without the consent of her parents; though, with their consent, she would marry him. After this conversation, she consented, at Mr. Power's suggestion, to see Gojon, to whom she repeated the same declaration. Gojon then suggested, the idea of her going to some house, where her parents should not be able to find her, until their consent should be extorted, which she refused, and said, that she wished to return to the place she came from, and did not wish Gojon to accompany her. He succeeded however, in inducing her to get into a carriage with a certain Mrs. Matthieu and her daughter; and he was observed by Mr. Power to give secret instructions to the coachman. Mr. Power testified, that Miss Ferlat afterwards stated, that instead of going back to Miss McLeod's, as she had been promised, Gojon had taken her to the house of her former music master, with whose family she was not acquainted: that soon after she was seated, a minister in his robes entered the room, upon whose appearance she was so overwhelmed, that she was taken out of the room by the ladies present: that after she recovered herself, they persuaded her to return and go through the ceremony: that she did so, in order to be able to escape to her friends; and shortly after the ceremony, she told Gojon that she did not consider herself his wife. By Miss McLeod's testimony it appeared, that Miss Ferlat had returned to her, about half after eight o'clock the same evening, apparently, in great agitation; and that as soon as she was able to state the cause, she had narrated the circumstances substantially, as above; and more particularly, that she had been decoyed to the music master's, under pretence of being brought to Miss McLeod's; and that she had there given an apparent consent to the marriage ceremony, from her fear of some compulsion or violence, and with intention to escape to her friends; to whom she did in fact, return that evening, from the house of Miss McLeod. She stated to Miss McLeod in this conversation, that she would never live with Gojon, as his wife.

The marriage ceremony was performed by the Reverend Mr. Schroeder, whose testimony was taken. It appeared, that Mr. Schroeder was led by a series of artful circumstances, to suppose, that all was proper in the marriage ; though from the subsequent inquiries which he made, he had no doubt, that the whole was a fraud. Gojon had since stated to him, that Miss Ferlat had refused to live with him, as her husband. The testimony of Mr. Ferlat and of Mrs. Ferlat her mother, fully confirmed the preceding statements, so far as their knowledge extended. A long letter from Gojon to Mrs. Ferlat, was produced, as affording manifest proof of a disordered mind. A record of a court in Pennsylvania, by which it appeared, that Mrs. Matthieu, one of the confederates, had been three times, convicted of burglary, was also produced. This record was offered as farther evidence of the depraved character of the defendant's abettors.

MR. SAMPSON argued the cause ex parte, for the complainant. The question to be decided, being of great importance and entirely new in this state, the court expressed a willingness to hear the fullest discussion which Mr. Sampson might think proper. From the interesting and unusual character of this discussion, Mr. Sampson's learned argument is here given, with little abridgment.

MR. SAMPSON. The bill prays, that the marriage may be declared null and void, and that the complainant may be discharged from its obligations. From the allegations and proofs it is plain, that it was entered into on the part of the complainant, in circumstances of agitation and surprise, without due consideration, and only consented to, as a method of escaping from present and imminent danger of violence or dishonor, with the firm design of instantly disavowing it, and hastening to the protection of her parents and the law. The facts which have come to light, show that female and delicate instinct, which in the absence of friends or counsel, dictated this expedient. The developement of the character of the confederates, justifies the apprehensions of the complainant; and allowance being made for the difficult and bewildering circumstances in which she was placed, renders her an interesting object of compassion and of the fullest protection of the

1825.

FERLAT
v.
GOJON.

10th June.

1825.

FERLAT
v.
GOJON.

law. It would be a scandal and reproach to our laws and their administration, if they should prove inadequate to rescue so innocent a victim of fraud and oppression, from that chain of misery and degradation, which, if she be not relieved by this court, must hang around her for the remainder of her life.

The questions presented for adjudication, then, are these :

1. Is there a good and legal marriage, de jure et de facto ?

2. If not, is it good de facto et non de jure ?

3. If good de facto and not de jure, does it require a judicial sentence to declare it null and void ?

4. If so, is this court competent to pronounce such decree.

The case of Wightman v. Wightman 4 John. ch. 343, is a case in point, so far as it proves that a marriage without full and free consent, is not void de facto, and requires a sentence of nullity to protect the party from the consequences of marriage. That was the case of a lunatic, who having returned to a lucid interval, refused to ratify the marriage, having never cohabited with the defendant ; and who but for the temporary derangement of her understanding, would never have consented to it. This is equally, a case of a temporary deprivation of the reasoning power, with the additional circumstance of fear, in itself the strongest of all impediments, and of fraud, which vitiates every contract, by every law human and divine. Sir John Nichol, in a late case in the prerogative court, speaking of the case of Styles v. West, cited in 1 Roll. Abr. 357, and in Manby v. Scott, 1 Sid. 112, and which has found its way into many other books, as showing that the marriage of an idiot was good, calls it in the words of Sir William Blackstone, 1 Com. 438, " a strange deci-
" sion ;" and observes, " that modern resolutions have adher-
" ed to the reason of the civil law, and that want of reason
" must of course, invalidate a contract and the most import-
" ant contract of life, the essence of which is consent." See
Co. Lit. 80 a. n. 1. Harg. and Butler. " The exact line of
" separation between reason and incapacity" adds this judge,
" may be difficult to be found and marked out, in the abstract,
" though it may not be difficult, to decide upon the result of
" the circumstances ; and this appears to be a case of that de-

" scription, the circumstances being such as to leave no doubt " upon my mind." 2 Phillimore's Reports, p. 69. 70. " The " main fact" he adds, speaking of the case before him, " is " that she went through the ceremony of marriage." " That " alone" he says, " can not be sufficient. If it were, no " marriage could be invalidated, unless all the parties were " confederates in the fraud. p. 83. There were three wit- " nesses, the clergyman, the sexton and the clerk. There is " no reason to charge the officiating persons as confederates, " but as persons deceived. The persons who were present, " were the confederates and those deceived." Just so, was the Reverend Mr. Schroeder in this case, deceived by the appearance of willing acquiescence ; but after the most conscientious inquiry into the truth, he became convinced, that this consent of Miss Ferlat was feigned, for the purposes set forth in the bill, and that neither in a social or religious view, the marriage ought to stand.

Though the distinction between matrimonial causes which belong to the spiritual courts and to what is called in England, the matrimonial law, is important in that country, since the time when the clergy usurped the entire jurisdiction over unscriptural marriages, and of annulling them pro salute animæ, 1 Bl. Com. 433. ib. 92 ; yet even there, taken in a civil light, the law treats marriage, as it treats all other contracts, and as good only where the parties are willing and able to contract, and do contract, in the proper forms and solemnities of law. The common lawyers however, are said to have borrowed their notions of legitimacy of marriage from the civil and canon law; the only difference being, that the ordinary tribunals of law and equity consider a marriage de facto good, until sentence of avoidance by the spiritual court, to whom they refer the decision of such disabilities. 4 Bac. Abr. 532. Gwil. ed. marriage and divorce B. Our books are silent as to those canonical disabilities, which became entirely the province of the ecclesiastical courts ; excepting so far as they come collaterally or incidentally, in question. 1 Bl. Com. 435.

Both the civil and the canon laws agree, that matrimony ought to be contracted, with the utmost freedom and liberty

of consent imaginable. The most they allow is, that the defect of consent may be cured by a spontaneous cohabitation for so long a time, that the cause of fear may be presumed to have ceased, and that a spontaneous consent has taken its place. The principal thing they require to a legal marriage, is the consent of the party contracting. Ayliffe's Parergon, 361. 362. It ought to be without fear of any person; for matrimony contracted through any impression of fear, is null and void ipso jure, and does not require to be rescinded by the action in the civil and canon laws, quod metus causa; because marriages against the will of either party, are usually attended with very bad consequences; and therefore, all statutes and decrees made against this liberty of the parties, are null and void, in their own nature. So, in the institutes of the canon law. Lib. 2. Tit. 12, p. 267. " Quæ matrimo-" nium impedire possunt. Justus metus nisi purgatus fuerit, " impedit matrimonium. Coactio quoque et justus violentiæ " metus, cum enim solo consensu conjugum contrahitur, " plena debet ille securitate gaudere, cujus animus indagan-" dus est, ne metu impulsus, dicat quod sibi placeat quod " odit." In the marginal comment upon the word coactio, it is said, that in case of women, less fear will amount to an impediment, than in the case of men, " ob sexus imbecilita-" tem." And upon the word securitate, " et sic in ma-" teria matrimonii, voluntas coacta non habetur pro volun-" tate." And upon the word impediunt, that when there is any doubt touching the presence of such fear, two witnesses to the fear are more to be credited, than a thousand deposing to the freedom of consent. " De metus interventu, " magis creditur duobus testibus deponentibus de metu, quam " mille deponentibus de spontanea voluntate." But it is added, that regularly, " metus actum ipso jure non infringit, " sed ope duntaxat exceptionis." So that even in their law, a judicial sentence of nullity is required; or the fact must be pleaded in bar, as the case may be.

The same principle is laid down in the treatise de contractibus of Mozzius, an eminent Italian writer of the sixteenth century. In speaking of marriage as a contract, p. 914. " Notandum est, quod minor metus censetur justus in fœmi

1825.

FERLAT
v.
CRUN.

" na, quam in viro, propterea quod in fœmina, a natura in-
" est minor animae fortitudo et vigor, quod arbitrio judicis
" relinquendum est:" with an exception, as to free cohabi-
tation for a year and a half. He cites a verse, which applies
with great force, to the act and conduct of this complainant.
" Effuge dum possis, ne consensisse videris."

Sanchez whose works, though a disciple of Loyola, are
read as class books in the university of Oxford, in his elabo-
rate work, de matrimonio, says : " Quia dictum plena liber-
" tate gaudere debet matrimonium, et quia minime gaudet
" hoc, levi metu interveniente, ideo minor metus sufficit in fœ-
" minam ut sit gravis irritetque matrimonium ; quia propter
" imbecilitatem, minor metus eundem affectum in illam opera-
" ter quam major in viro." He proceeds to show, that a
slight cause of fear or levis metus, may be adjudged gravis
metus, where it operates upon a woman or a weak man : and
that as all other contracts are in foro conscientiae, invalid,
when made under the influence even of slight fear, matrimo-
ny requires the greatest of all freedom of the will.

These authorities may suffice to show, how the matrimo-
nial contract has been regarded in all countries and ages of
the civilized world, upon principles of natural law and reason,
independent of positive institutions or ceremonial rites.

The cases decided in the English temporal courts both of
law and equity, agree in every thing, except the power of
declaring the marriage null, or pronouncing divorces for super-
venient causes. The same leading maxim governs through-
out : consensus non concubitus facit nuptias ; so that cohab-
itation alone, though the strongest evidence of consent, will
not avail, where it appears, that such consent was not abso-
lutely free and spontaneous.

We have, and perhaps it is to be lamented, no ordained
solemnity, either to attest or validate this most important of
all contracts. The English marriage acts were not consis-
tent with our new state of being ; and none have yet, been
substituted. The intervention of a priest was not formerly
necessary, and is merely, positivi juris. Even in England,
a marriage, though celebrated in facie ecclesiae, was thought
to be void by judges of the common law, before sentence, if

the wife were under duress. But such a marriage is now held binding, until sentence of nullity.

So where upon an indictment on the statute 3 H. 7. for abduction, the prosecutor had declared herself willing and had been found in bed with the defendant, but the evidence showed, that she had been brought to the bishop of Winchester's house, and on pretence of showing it to her, had been taken into the chapel, and there married, in the presence of the defendant's mother and divers other persons; it was held, not to be a marriage de jure; because she affirmed upon her examination and upon her oath, that she was in such fear, that she knew not what she answered or did. Yet it was a marriage de facto, and a felony: and judgment was given that they should be hanged. Fulwood's case, Cro. Ch. 482. 484. 488. 492.

So in Rex v. Brown, where an heiress had consented to marriage, but the consent was caused by precedent menaces, the defendant had judgment to die. 3 Keb. 193. Hale treating of this last case, says, the reason she gave evidence, was, 1. she was rescued, flagrante crimine, before she was defiled: 2. it was a forced marriage, and so no marriage de jure: 3. no cohabitation: 4. there was concurrent evidence to prove the whole fact; and she was a good witness, being but a wife de facto.

Tarry v. Brown, 1 Sid. 64. trespass for breaking the house of the plaintiff and taking a woman &c. The cause turned upon the validity of a marriage by a person in sacred orders, while the law which gave power to justices of the peace to marry and to annul marriages, was in force. The court were of opinion, that all the world could not dissolve a marriage once legally solemnized, and without impediment. Twisden said, that this act was against the law of God and void; and all the court ruled, that marriage was a spiritual affair, belonging to the ordinary; and that they would not intermeddle, either to marry or unmarry. But the court added, that if the marriage was by duress of the woman, it ought to be void, and then trespass would lie. This case which occurred in the thirteenth year of Charles the second, partakes strongly of the temper and spirit of that time; but it shows, that the com-

mon law tribunals are not competent to annul a marriage de
facto ; and that a sentence is requisite, which in England, must
be by the spiritual judge.

Bracton lays down, that in actions of dower, the tenant
may admit, that the wife was endowed ad ostium ecclesiae,
but plead, that the marriage was afterwards dissolved and a
divorce had, by reason of consanguinity or other cause, so that
the right of dower was lost. To which the widow may re-
ply, that no divorce was pronounced in the life of her husband,
or that there had been an appeal, and that her husband died
before it was decided. Bracton, book 4. 304.

Fleta says, that dower is demandable, whenever the mar-
riage is celebrated; and ceases only when the marriage is
dissolved in the lives of the contracting parties. And in
Rolle's abridgment, it is said, that for all antecedent causes
which show no marriage, there shall be no dower, if the mar-
riage be declared null, in the life of the parties. 1 Roll. abr.
681. Co, Lit. 33. b. s. p.

If it be now shown, clearly, 1. that this was not a marriage
de jure : 2. that it was still a marriage de facto : and 3. that
it requires a judicial sentence, it remains to be seen, whether
this court is competent to pronounce that sentence.

I might perhaps, have trusted to the authority of Wight-
man v. Wightman; but as it has been said by a great judge,
to be safer to stick to known and general rules, than to any
particular precedent, and as the additional circumstances of
fraud, conspiracy and duress enter into this case, I have
thought better to present it to the court, as a case entitled to
relief not as a matrimonial cause, but as a civil contract from
the obligation and effect of which, the injured party is to be
relieved as from any other engagement entered into without
consideration, or through fraud or circumvention or against
public policy, or against good morals, decency and piety, and
which the strict forms of the common law tribunals can not
reach. If such be the jurisdiction of this court touching all
other contracts, it would be strange, that the contract which
is of all the most sacred and grave in its effects, upon which
the destiny of human life, the honor of families and some-
times, the hopes of another life may depend, and which is

the very corner stone of social order, should be unregarded and put out of the protection of justice and the law. Can this court decree deeds to be cancelled because of fraud or duress in obtaining them, releases to be given or given up, judgments to be vacated, and punish the parties who would dare to enforce them ; give relief for and against infants, notwithstanding their infancy, entertain the suits of husband against wife and wife against husband, notwithstanding their coverture ; and yet turn a deaf ear to the voice of a mother worse than bereft, and a daughter praying to be restored to the bosom and protection of her parents, to virgin innocence and maiden honour, of all which she has been robbed by practices of foul conspiracy, and where if not relieved by this court, she must wear through life, the loathsome chain of most unhallowed bondage ;  a chain more fatal than that by which tyrants have bound the living to the dead ; for this would bind innocence to guilt, in an indissoluble bond. Why is the law so anxious for the freedom and purity of that institution invented in times of innocence and for the preservation thereof, that it will suffer no condition to be annexed to a spontaneous gift tending to clog its freedom ; as that, without the consent of such an individual, a portion shall not vest ? Why, but because that mutual contract which is to last for life, should be the effect of perfect freedom in the choice and will, and lest any temptation should induce the joining with willing hands, unwilling hearts ; lest when the temple doors are thrown open to receive the vows of everlasting faith and truth, sin, shame and misery should enter in, and mingling with holy rites, profane the altar and pollute that contract, on which the destiny not only of the living, but of those yet unborn, must depend.  Why does this court decree that bonds for marriage brokerage, shall be given up ; and that even the party to the crime shall be released ; but that it holds jurisdiction of what concerns the purity of wedlock, and will not suffer it to become the subject of any venal speculation.  1 Madd. ch. 216.

It is true, that in England, it is referred to the ecclesiastical judge, to declare a marriage void, where just impediments existed, at the time of its celebration, as impotence, precon-

tract, affinity or consanguinity; but first and chiefest of all, where fear has intervened, or causa metus, as it is laid down by Lord Coke, speaking the language of the common law. 1 Inst. 235. a. It is true, that the spiritual courts in England, have usurped the office of declaring when these impediments exist; but does it follow, that without their ministry, the law can not exist? If so, it was in an evil hour, that their powers ceased, for with them fell the corner stone of all social order, all grace and decency in human life; and in its place, must come vice and licentiousness, through every walk of life, promiscuous intercourse, spurious offspring, neglected education, and universal scandal in the sight of God and man.

It is true, there are no precedents of any such decree as is here sought, by English chancellors; but that can be no argument. Long before the equitable powers of the court of chancery were called into activity, by the growing exigencies and necessities of advancing civilization; in the long conflicts between kings and popes, when the thunders of the Vatican could raise the usurper to a throne or hurl the legitimate from it; then, when the empire was divided between Jove and Cæsar, were these concessions made; and then, when matrimony was held to be a church sacrament and not a civil contract, as it now is with us, the churchmen took it into their holy keeping; but still be it observed, in due subordination to the civil authority, to the common and the statute law. Repertorium canonicum 133. ch. 11. ad finem " of courts and of their jurisdiction." The case of praemunire Davis' Rep. 84, and 3 Bl. Comm. 61. Their proceedings were but modes of proof, and their certificates, but evidence to the temporal judges, of the fact contained in them; conclusive it is true, whilst acting within the sphere of their office, but void and prohibited, in all beyond it. Not so, the jurisdiction of this court. Its duty is to afford relief wherever the great principles of law and justice call for it; not indeed, in contravention of the established law, but in aid and furtherance of it; to form the complement and answer the ends of universal justice; to begin where the law left off or remained silent, and to execute what the rigid and unexpan-

1825.

FERLAT
v.
GOJON.

sive forms of its writs and processes could not reach. Its jurisdiction has never been and can never be otherwise defined. It is not precedents that give it jurisdiction; but its jurisdiction, that gives precedents. All the precedents which time has woven into system, were new in their respective days; and if this court is not justified in the decree now sought, it never was in any case; for none ever called so loudly, for its extraordinary jurisdiction.

Here, is a contract obtained by fraudulent contrivance, by suppressions of the truth and suggestions of falsehood, by duress and by surprise, entered into by a girl of nineteen, in a moment of great agitation and apprehended danger, no matter whether real or imaginary; the consequences of which must blast her maiden honor, endanger her virtue, and bring her tender parent who bore her with anguish to the grave. And is there no relief, no helping hand, no mercy or justice in the law? Are we yet, with all our boasted institutions, in that state of uncivilized barbarity; with all our subtle and refined distinctions, with all our infinity of books and cases, can we find no remedy for such an evil? Must fraud and conspiracy triumph with impunity, and youth and innocence droop and decay, like a tender blossom on a wounded stem, and no one be found to bind it up or shelter it? Is it because this contract is so holy and beyond all others sacred, that our laws are too unholy and profane to meddle with it? Must our judges for very reverence, look on, and shutting their ears to the cries of religion and humanity, turn their backs upon the desolating ruin? Must the poor victim of iniquity be doomed to suffer all the consequences of an ill omened and a barren union; be bound forever to honor and obey one whom she can not honor and obey, because we have no spiritual court, no doctors' commons, no doctors or proctors? Must this be the answer of the only earthly judge to whom she can appeal? Address your complaint to the great judge of judges: no doubt your prayers will find grace in heaven; but our law allows you nothing, but to weep and to despair; for we can not excommunicate, and there is no other remedy. It was not so, in England during the short period of their commonwealth, while the spiritual courts were

superseded. We find in 2 Shower 282, these words. "In "the late times, they sued for alimony in chancery; and the "judges were then of opinion, that there being no spiritual "courts nor civil law, the chancery had the jurisdiction in "those days: but now, we have courts christian, and the "chancery will allow demurrer to such bills for alimony."

In the approved lectures of judges Reeve and Gould, it is said to be "hardly consistent with justice, that contracts which "respect ordinary matters, should be treated as void, while "the most important of all contracts, should be deemed invi- "olable, though obtained by fraud or imposition. The truth "is, a contract which is obtained by fraud, is no contract. "A marriage obtained without consent, can never be deem- "ed valid; nor is there more reason for sanctioning a mar- "riage obtained by fraud, than one obtained by violence. "But still, a decree is necessary to declare it void, that all "concerned may be apprized of its dissolution." "All the "apprehensions of conscientious men, as to separating man "and wife, are dissipated in this view of the subject, which "decides that there never was marriage at all." The same eminent judges in another place, say; "whether a marriage "obtained by duress of the woman, but duly and legally "solemnized, is void, has been the subject of different opin- "ions." "It is difficult to conceive, why a contract confes- "sed to be the most important, should be valid when obtain- "ed by duress, while all other contracts are not so."

A more specious objection may arise from the special pow- ers which the legislature have conferred upon the chancellor, in certain cases, as that of decreeing divorces for adultery and separations for cruelty. In respect to the first, the an- swer is easy and obvious. Whether the entire jurisdiction of the spiritual court, is devolved here, upon the chancellor or not, no implication can arise against his general jurisdiction, from this new power so expressly given; because it is a pow- er which neither the chancery nor the ecclesiastical courts ever did claim or exercise. A marriage once good and valid, could not be dissolved by any court, for any cause whatever; nothing but the omnipotent power of parliament ing able to effect a dissolution; and such a dissolution was

not a judicial, but a legislative act. The silence of the legislature as to other powers so necessary to the general ends of justice and the safety of the people, is a strong argument, that no legislative enactment was required; for it would be a perversion of the doctrine of implication to suppose, that because the legislature added to the powers of the chancellor, others beyond what he or any court before possessed, his general powers were therefore, abridged. If they had not supposed, that the chancellor had power to decree a marriage void for such impurity and fraud, they would, while acting on that important matter, have given it to him or to some other tribunal; for they could not be blind to the necessity that such a power should somewhere exist. As fathers, husbands, brothers or good citizens, they must have felt it at their hearts; and instinct would have dictated it. They knew that it could belong only to the chancellor; they acknowledged, that he was the only magistrate to whom such jurisdiction could belong; and without any preamble or recital, they conferred new powers upon him; providing at the same time, for the mode of proceeding, and securing to the party the trial by jury.

In the act to restrain persons from marrying until their former husbands or wives be dead, there is a proviso which shows, that the legislature must have understood, that some court existed competent to declaring unlawful marriages void. The proviso is, that nothing in the act shall extend to any persons who are or shall be divorced by the sentence or decree of any court having cognizance thereof; nor to cases in which the former marriage had been or shall be by the sentence of such court, declared void. If it had not been supposed, that the court of chancery was competent to make such a decree, would not the legislature have provided some other tribunal competent to the acknowledged exigency? This latter act was passed in the year next succeeding the former, recognizing at the same time, the principle of both total and partial divorces, by a competent court, a court having cognizance of the subject, when the parties were resident within its jurisdiction. That court was of course, the court of chancery. If this court had not been thought competent,

some other would have been created; as were the offices of surrogate and judge of probates, for the granting of probates and letters of administration.  But the power to divorce, was then expressly added to the chancellor's general powers.  The power of decreeing a marriage contract null, when tainted with fraud or obtained by duress or surprise, was coeval with the first principles of equity itself.

So the law concerning divorces, 2 Rev. L. 197, seems to take for granted, that the chancellor is the magistrate to whom such jurisdiction must inherently belong; since without any words giving new jurisdiction, it directs the course of proceedings, and confers some powers over the husband's estate, not confined to the mere granting of alimony to the wife, but for the maintenance of children; which had never been exercised by the spiritual courts, and might therefore, require such declaratory law to clear away all doubt as to his powers and their extent in these particulars.  Finally, if we are to argue by implication or intendment, which is the most reasonable supposition, that there should be no relief against a fraudulent contract of marriage, or that there should be relief.  Intendments should be in furtherance of justice; and in this case if in any, boni judicis est ampliare jurisdictionem suam.

THE CHANCELLOR.  This is a case of a marriage procured by fraud.  Miss Ferlat was entrapped into a marriage with Gojon, by artifices which he employed; and though she gave an apparent consent at the moment of the celebration, yet it fully appears, that this consent was feigned, and that it was the effect not of her choice, but of her terror.  The clergyman who celebrated the nuptial rite, supposed, that he was marrying persons who were free and had freely contracted; and he was deceived.  The complainant never consented freely, to become the wife of the defendant; she has never cohabited with him; and this marriage was a foul fraud practised upon her by the defendant.

Marriage is considered by our law, as a civil contract; and in this agreement, as in all others, the free consent of the parties is essential to the validity of the contract.  Here, was

63

no free consent, no voluntary contract; and this fraudulent marriage must be null. Still, a marriage in fact or in form, has taken place, between these parties, in the manner most usual in this state.

Upon the facts of this case, there can be no doubt, that this marriage would be treated as null, by every court of this state, in which its validity might be incidentally drawn in question. The courts of law may try and decide this question, in any of the actions or proceedings which belong to their jurisdiction; such as prosecutions for bigamy, actions of dower, suits in which marital rights are claimed, or any other proceeding involving the legality of the marriage. But a court of law in any of those proceedings, pronounces the marriage valid or void, only for the purpose of deciding the particular suit in which the question arises; and the decision is conclusive, for no other purpose. The question is left undecided, in every other respect; the same question may be again and again litigated, in other suits and in other courts; and it may receive different decisions from different tribunals. This limited power of the courts of law, is inadequate to the ends of justice and the interests of society. Marriage is one of the chief foundations of social order; it involves moral duties and legal obligations of the most serious concern; and the ties and relations which result from it, are of the highest importance to the parties and to society. Morality and policy require, that it should not be left unknown or uncertain, either to the parties or to others, whether the relation of husband and wife, exists or not. A power should exist in some judicature, to determine these questions: and such a power should be competent to determine them, for every purpose; to establish the union, where the marriage has been lawful; and where the parties have been illegally married, to sever them and to vacate all pretensions to the relation of husband and wife. Paley's Moral and Political Philosophy, book 3. part. 3. 1 Wooddeson's Lectures, 423.

The jurisdiction of this court is that of the English chancery, with the various additions which have been made to it, by our own laws. This court has jurisdiction in cases of fraud, and especially, in all cases of contracts procured by

fraud. In such cases, this court effectually annuls the fraudulent contract, adjudges it void, causes it to be delivered up or cancelled, or prohibits the parties from claiming any right under it. Such is the undoubted jurisdiction of this court, in other cases of contracts; and if this court has not the same jurisdiction where the contract of marriage has been procured by fraud, it is the only case of a fraudulent contract, to which its jurisdiction does not extend.

In England, the ecclesiastical courts would have cognizance of such a question, and would annul the marriage : but it seems, that even in England, the court of chancery would also have jurisdiction of such a case, as a fraud. If no instance of this kind is found, in which the English chancery has acted, it is evidently, because the ecclesiastical courts there, have an established jurisdiction, and give a summary remedy, in all matrimonial causes. We have no such courts, and no judicature possessing the general powers of those courts. The jurisdiction of equity in cases of fraudulent contracts, seems sufficiently comprehensive, to include the contract of marriage ; and though this may be a new application of the power of this court, I do not perceive, that it is an extension of its jurisdiction. It would be deplorable, that in a case of fraud so gross, there should be no adequate remedy ; and to give the same relief in this case, which this court gives in other cases of contracts procured by fraud, is no assumption of any general jurisdiction over matrimonial causes. Reeve's Domestic Relations, 206. 207.

In the case of Wightman v. Wightman 4 Johns. ch. 343, the late chancellor annulled a marriage between parties of whom one was a lunatic ; and the case now before the court, belongs still more clearly, to the jurisdiction of equity.

The authority of this court to divorce in certain cases, is a power given by our own statutes ; and is entirely distinct from the general jurisdiction of the court, in matters of equity.

Viewing this contract as one obtained by fraud, and upon this ground alone, I am of opinion, that this court has cognizance of the case, and may annul this marriage. The decree will declare, that the marriage between these parties, was obtained by the fraud of the defendant ; and will adjudge it to be utterly null and dissolved.