(92 Misc. Rep. 279)

DORGELOH v. MURTHA.

(Supreme Court, Special Term, Kings County.　November 19, 1915.)

1. MARRIAGE ☞60—ANNULMENT—FRAUD AND DURESS—EVIDENCE—SUFFICIENCY.

Where plaintiff, then under 16 years of age, desiring to secure a theatrical engagement, could not secure the consent of her mother or other guardian, and it was suggested to her that a marriage certificate be forged, so that it would appear to be lawful to engage her in such employment, to which she consented, but instead the defendant and his friends persuaded her, under statements that it would not be binding, and by actual force in taking her into a church, to go through a ceremony read by a Protestant minister, the defendant being a Catholic, during which ceremony she wept and objected to its consummation, and no certificate was ever issued, and the marriage was never completed by cohabitation, and defendant never contributed to her support, nor admitted her to be his wife, and thereafter both plaintiff and defendant married other persons, the marriage of plaintiff to defendant was void ab initio, since there was no meeting of the minds, or consummation, and there was both fraud and duress practiced upon the plaintiff.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 125–128, 130–135; Dec. Dig. ☞60.]

2. MARRIAGE ☞18—CONSENT OF PARTIES—INTENT.

Marriage is a civil contract, of which consent of the parties is the essence, and no words, in the absence of intent to enter a valid marriage, will make the marriage valid.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. § 9; Dec. Dig. ☞18.

For other definitions, see Words and Phrases, First and Second Series, Marriage.]

3. MARRIAGE ☞42—CONTRACT—EVIDENCE.

That parties to a marriage in form subsequently denied, and never consummated or ratified, the marriage, is evidence of absence of intent to enter into a valid marriage.

[Ed. Note.—For other cases, see Marriage, Cent. Dig. §§ 70, 78; Dec. Dig. ☞42.]

Action by Estelle Dorgeloh against Alphonsus Murtha, alias Alphonsus Murtagh, for annulment of marriage ab initio. Judgment as prayed.

Robert H. Haskell, of Brooklyn, for plaintiff.

Peter P. Smith, of Brooklyn, for defendant.

ASPINALL, J.　This is an action to have a marriage adjudicated as null and void ab initio upon the ground that the plaintiff had not attained the age of 18 years at the time of the marriage; that the consent of the father, mother, guardian, or other person having legal charge of the plaintiff had not been obtained; that the marriage was not consummated by cohabitation, and that there was no ratification by any mutual assent of the parties after the plaintiff had attained the age of 18 years; and also upon the ground that the consent of the plaintiff was obtained by force, duress, and fraud. The defendant joins with the plaintiff in asking for the same relief that is prayed for by the plaintiff.

It is also contended by the plaintiff that she is entitled to a decree based upon the proposition that a marriage never existed between the plaintiff and the defendant in fact or in law, that there was no meeting of the minds, that there was no consent or agreement to marry, and that a decree should be granted declaring the marriage void ab initio upon the ground that it has never existed.

The facts are substantially as follows:

The plaintiff on May 1, 1897, at which time she had not yet attained the age of 16 years, entered into a marriage with the defendant under the following circumstances: It appears from the evidence that this plaintiff was born in Montreal, Canada; that at the age of 13 years, or thereabouts, she came to Brooklyn with her mother and two sisters to reside; that shortly thereafter, in January, 1897, her mother went abroad; that one of her sisters and her husband returned to Canada more than a year prior to May 1, 1897, and that in April, 1897, the other sister and her husband left for New England, leaving their younger sister, this plaintiff, alone in the boarding house where they had all been living; that shortly thereafter the plaintiff was introduced by a friend to one Emma Palmer and her sister, Mrs. Reilly, at a theater, and in the course of the conversation they inquired of the plaintiff what the nature of her employment was, and intimated that she should adopt the stage as a profession, and that she would make a great success in that line. The plaintiff was finally induced, within one week after the departure of her older married sister, and upon the solicitation of these people, to change her abode and take up her residence with them; that thereafter Mr. and Mrs. Reilly and Emma Palmer talked to the plaintiff of nothing else but going on the stage. She was prompted to believe that she was possessed of ability to become an actress, and became so imbued with this idea that it finally became an obsession with her. Mr. Reilly assured the plaintiff that he was a theatrical manager and had been an actor. She finally interviewed theatrical managers, who informed her that on account of her being under the legal age they could not provide her with an engagement without first having the consent of her mother or guardian to such employment. She related the result of those interviews to the Reillys, and numerous suggestions were made by them as to what could be done to overcome this objection, and it was finally decided that if a blank certificate of marriage was obtained they could fill it in for the plaintiff and she could then pretend to be married, and in accordance therewith it was intimated to her that she should obtain a blank certificate at some stationery store and that Mr. Reilly would fill it in. The plaintiff consented, thinking, as she testified, that it would be a great joke. The suggestion as to obtaining the blank marriage certificate was made to the plaintiff about one week before the ceremony, and prior to that time the plaintiff and the defendant had only met on one occasion at the Reilly home, where they were introduced to each other. There had been no courtship between them and they were merely casual acquaintances.

On the evening of May 1, 1897, the date of the ceremony, the plaintiff, the defendant Philip Reilly, and Emma Palmer started for a stationery store with the intention of obtaining a blank marriage certifi-

cate. As they walked along it was suggested by Mr. Reilly that they go over to Seventh avenue, where there were many churches; that they could get the name of one of those churches, also the name of a minister, to put in the certificate, to which the defendant replied that that was not necessary, that they could fill in any name, and that would be sufficient. They finally proceeded to Seventh avenue, and as they approached one of the churches Reilly suggested that they go in and procure a blank certificate having the name of the church and perhaps the minister's name on it, that it would appear to be genuine by reason thereof, and that if such certificate were filled in there would be no difficulty in saying that the plaintiff was married. The plaintiff, however, objected to this proceeding upon the ground that she did not intend to be a party to any deception being practiced upon a minister of the gospel.

[1] The testimony of the witnesses as to what occurred at the time of entering the minister's house, where the ceremony was performed, and thereafter, establishes conclusively, in my opinion, that the mind of the plaintiff was overcome by that of Reilly. The plaintiff was a young girl in short dresses, not having attained her sixteenth year, immature, imaginative, inexperienced, innocent as to the ways of the world, and I am satisfied that she was not sufficiently enlightened to be able to realize the full purport of the ceremony into which she had been led unwillingly. It appears from the evidence that the plaintiff demurred quite strenuously to entering the minister's house; that she reluctantly walked up the steps, hesitated, descended again, asking the others to go with her; that she was taken up the steps again by Reilly and the defendant, and assured that the ceremony was not to be taken seriously—that it was not going to be a marriage.

After entering the minister's house it appears that the plaintiff began to weep. All the evidence as to the situation at this particular time, when the ceremony was performed, points to one conclusion only, namely, that the plaintiff was impelled to be one of the participants therein only after having been assured that it was not to be considered as a marriage; that it was only intended to be a deception and subterfuge, having in mind only the obtaining of a marriage certificate which she could present to theatrical managers to overcome the objection of lack of age in her quest for a theatrical engagement. The testimony of the defendant, who was 17 or 18 years of age at that time, substantiates that of the plaintiff as to the occurrences at the time of the ceremony, only with greater positiveness. It also shows that he called at Reilly's home casually on the evening in question, and was then asked by Reilly to go with them in their quest for a blank marriage certificate, to which he agreed, and was thereafter a participant in all the events hereinabove recited leading up to the ceremony. It also appears that it was never his intention to enter seriously into this ceremony; that he never contemplated entering into the bonds of matrimony with the plaintiff; that he had been drinking and was more or less intoxicated.

He also testified that he was a Roman Catholic, and that, in my opinion, is to be taken as corroborative of his statement that he never entered seriously into this ceremony, the plaintiff being a Protestant, and

the minister performing the ceremony also being a Protestant; but he considered that it was a mock marriage, and not to be taken seriously, so he was not concerned, which, in my judgment, shows an utter lack of intent upon his part to be bound by this ceremony, and that it was performed only for the purpose of enabling the plaintiff to obtain a certificate of marriage which could be used by her for presentation to theatrical managers in her effort to obtain employment. He also testified that he considered the ceremony more of a lark than anything else. The lack of intent to be bound by this ceremony is still further evidenced by the fact that subsequently, in the year 1906, the defendant married and is now living with his wife in the state of New Jersey.

The defendant also said that he participated on the request of Mr. Reilly merely for the purpose of obtaining a certificate of marriage which could be used by the plaintiff for the purpose heretofore mentioned. It appears that the defendant was emphatic in his statements to the plaintiff at all times that no marriage had taken place between them, that he was not her husband, and that she was not his wife. No wedding ring was provided at the ceremony, nor did the minister furnish them with a certificate. None of the incidents which usually attach themselves to such occasions were present, such as the presence of the families of the contracting parties, their relatives and friends; everything was done on the spur of the moment, without any serious intention having been manifested. The defendant has never contributed to the support of the plaintiff, and has never been requested by her so to do. The families of the respective parties had never been informed as to the ceremony, at the conclusion of which the parties separated, and never met one another thereafter, with the exception of one occasion, a few days after the ceremony, when the defendant wrote to the plaintiff to meet him in front of the Young Men's Christian Association in Brooklyn, which she did, and he then again reiterated his former statements that they had not been married and that the plaintiff was not his wife. He also advised her not to remain any longer in the Reilly home, as he did not consider it a proper place of abode for her. It appears by the testimony that the plaintiff and the defendant never met again after that time until these proceedings were instituted, and that the ceremony was never consummated by cohabitation. The consent of the mother or guardian to the ceremony was never obtained.

Subsequently to the said ceremony the plaintiff was married to one Charles S. Barker, and lived with him as his wife until the year 1901, when he died. A daughter was born of that marriage on August 13, 1898, 14 months after the marriage. It also appears that the plaintiff was introduced to the members of the Barker family as the wife of Charles S. Barker, and that everything was harmonious between them until the matter of their daughter's rights was questioned; that subsequent to the death of Mr. Barker the plaintiff was married to one Henry F. Dorgeloh, her present husband, with whom she has lived continuously in Boston, Mass., until the question of the validity of this ceremony arose.

It is undoubtedly the fact that the plaintiff had not attained the legal age; that the consent of her mother or guardian had not been obtained; that the ceremony was not consummated by cohabitation; that there was no ratification after the plaintiff had attained the legal age of consent; and that force, duress, and fraud had been exercised against this plaintiff.

I am at a loss to find anything in the record which would justify the conclusion that a valid, legal, and binding marriage had taken place. It is quite true that there was a formal ceremony; but it is also patent from the evidence that there was no intention whatever on the part of either the plaintiff or the defendant that it should be considered as a valid and legal marriage. On the contrary, it appears affirmatively that the ceremony was entered into solely for the purpose of obtaining a certificate of marriage which could be used by the plaintiff in her endeavor to obtain a theatrical engagement, thereby overcoming the objection as to her being under the legal age.

[2] The law considers marriage in the light of a civil contract as to its inception. In the marriage contract, the same as in any other, consent is a necessary element. Consent, which is the essence of all ordinary contracts, is necessary to the validity of the marriage contract. The minds of the parties must meet in one common intention. Mere words, without the intention corresponding therewith, will not make a marriage or any other civil contract; but the words and acts are evidence of such intention, and it must be shown clearly therefrom that both parties intended that they were to have effect. I am satisfied from the evidence in this case that no marriage was intended by either party. It was a mere subterfuge, gotten up for the purpose of enabling the plaintiff to obtain a marriage certificate which would be of assistance to her in obtaining a theatrical engagement.

While it is true that marriage contracts are based upon considerations peculiar to themselves and that public policy is concerned with the regulation of family relations, nevertheless marriage is considered in law in no other light than as a civil contract. I am satisfied that sufficient evidence has been adduced to justify a court of equity in intervening.

There is no doubt in my mind that the necessary and material element of consent was lacking, that force, duress, and fraud were exercised upon the plaintiff and the defendant, and that consequently no marriage was ever effected between them, and such being the case it is the duty of the court, under the authorities, to annul the marriage. The mind of this young, inexperienced, and immature plaintiff was carried away by the acts and solicitations of Reilly, which amounted to duress and prevented her from acting of her own free will and accord.

[3] The plaintiff and the defendant have both repudiated the ceremony. The plaintiff has since married, and so also has the defendant, which may well be taken as still further evidence of the fact that neither one of the parties considered this ceremony seriously. There has never been any consummation of the ceremony between the parties hereto. The defendant has never contributed to the support of the

plaintiff, and she has never requested him so to do. The plaintiff never visited the mother of the defendant, nor did the defendant visit any of the plaintiff's relatives. The testimony indicates conclusively that there was never any intention on the part of either the plaintiff or the defendant to enter into a marriage. McClurg v. Terry, 21 N. J. Eq. 225; Kujek v. Goldman, 150 N. Y. 176, 44 N. E. 773, 34 L. R. A. 156, 55 Am. St. Rep. 670; Di Lorenzo v. Di Lorenzo, 174 N. Y. 472, 67 N. E. 63, 63 L. R. A. 92, 95 Am. St. Rep. 609; Hayes v. People, 25 N. Y. 397, 82 Am. Dec. 364; Moot v. Moot, 37 Hun, 289; Post v. Lary, Special Term, New York County (no opinion filed); Maloney v. Osborne, Special Term, New York County (no opinion filed); Aymar v. Roff, 3 Johns. Ch. 49; Ferlat v. Gojon, 1 Hopk. Ch. 478, 14 Am. Dec. 554.

It is my desire to save this plaintiff from her childish folly and delusions, and the consequences which might follow therefrom, if this marriage, fraudulently obtained, were enforced, if I may do so under and by authority of law, and I am satisfied that this court, under its broad, general equity jurisdiction, has inherent power to decree a dissolution of this marriage. People ex rel. Mayor v. Nichols, 79 N. Y. 582; Griffin v. Griffin, 47 N. Y. 134–139; Johnson v. Johnson, 150 App. Div. 308, 134 N. Y. Supp. 1081; Wood v. Wood, 61 App. Div. 96, 70 N. Y. Supp. 72; Fisk v. Fisk, 6 App. Div. 432, 39 N. Y. Supp. 537; Dehart v. Hatch, 3 Hun, 375; Wightman v. Wightman, 4 Johns. Ch. 343.

In conclusion I am convinced, under the evidence adduced herein and the law applicable thereto, that the prayer of the complaint asking for an annulment of the marriage ab initio should be granted.