## Bove, etc., v. Pinciotti

*Vincent C. Veldorale,* for petitioner.
*Dominic J. Colubiale,* for respondent.

Bok, P. J., July 28, 1942.—Petitioner asks for the annulment of a marriage which took place under rather unusual circumstances on September 23, 1939. He was then 16½ years old and respondent was 17.

Two months before the ceremony they had sexual relations either once or twice. Petitioner then left to work in Washington and when he returned respondent asked him to marry her, which he refused to do. She gave him a letter, apparently already prepared, and told him to read it when he reached home. It said, "By the time you read this letter I'll be dead and so will your baby." He went back to her home at once but found her

bedroom door locked and after breaking it open saw her lying unconscious on her bed with traces of iodine on her lips and an empty bottle beside her. He gave her first aid treatment and called a doctor, who brought the girl around with emetics in about an hour. When she regained consciousness she told petitioner she was pregnant and asked him what he meant to do. He said he'd marry her, but they agreed that it was only to give the child a name and that they would not live together as man and wife. Two days later they applied for a marriage license, which they got by misrepresenting their ages, and were married by a magistrate.

They never lived together, but separated immediately after the ceremony. Petitioner saw respondent on the street about six months later and said she looked normal, which meant to him at the moment that no child was imminent. He did not ask her about it.

Respondent was called by the master, not to contest the case but to fill in the gaps. Her story contradicted petitioner's in minor points but corroborated it in the main. She said that no child was born as a result of her pre-marital intercourse with petitioner, but that she met a Mr. Sparks in New Jersey shortly after her marriage, had intercourse with him in December 1939, and delivered a child on September 13, 1940. She seems not to know where Mr. Sparks is now, and she registered the child's father as unknown, as she said she did not want it to appear as petitioner's child, since it wasn't. The birth certificate of this child, which was offered in evidence, gives no birth date, but it is required to be filed within 10 days after birth and bears a filing date of September 19, 1940.

The imponderables, aside from the law, favor this child. It hasn't much of a heritage apart from the presumption that it was born in wedlock, and we feel it is entitled to that. There is no proof to the contrary save the word of its parents, and the policy of our law is not to allow them to bastardize issue by their own word

alone. See Janes' Estate, 147 Pa. 527 (1892), and Commonwealth ex rel. Moska v. Moska, 107 Pa. Superior Ct. 72 (1932).

Apart from this angle of the case there arises the broad question of whether an annulment may be granted to a couple who have married in proper form but who assert that it was done on conditions: these being, of course, that the marriage should be valid for the purpose of giving the expected child a name but invalid for all other purposes. We are of opinion that the annulment cannot be granted, not only because we believe the policy of the law is against it but because an annulment renders the marriage void ab initio, bastardizes the issue, and hence destroys the very purpose for which the parties married. To say that the failure of the child to materialize is a failure of consideration and hence avoids the point just made is merely to emphasize the artificiality of comparing the marriage contract to the ordinary civil contract. It is not possible to have a marriage for one purpose and no marriage at all for other purposes, for marriage is not only a contract but a status and a kind of fealty to the State as well. It is a pity, sociologically, that it is so easy to get into and so hard to get out of, and in trying to make our decision palatable to these young people, who would doubtless prefer bad law to their hard case, it need only be observed that it is difficult to make the law intelligent when the laws are not.

There is no square Pennsylvania precedent that we can find except Osgood v. Moore, 38 D. & C. 263 (1940), where the facts are almost identical. Judge Crichton granted the annulment, and we can take no other position than respectfully to disagree with him.

Annulment has been permitted only gingerly. It was not until 1935 that it was broadened beyond the one ground of bigamy. The Act of July 15, 1935, P. L. 1013, sec. 1, 23 PS §127, amended section 12 of The Divorce Law of May 2, 1929, P. L. 1237, to read:

"In all cases where a supposed or alleged marriage shall have been contracted, which is absolutely void by reason of one of the parties thereto having a spouse living at the time of the supposed or alleged marriage, or, if, for any other lawful reason, the said supposed or alleged marriage was absolutely void when contracted, such supposed or alleged marriage, may, upon the application of either party, be declared null and void, in accord with the principles and forms hereinafter prescribed for cases of divorce from the bond of matrimony."

The case before us must, therefore, concern a "marriage . . . which is absolutely void . . . for any lawful reason" if petitioner is to have relief.

Judge Crichton could grant it in his case only upon the theory that marriage is a civil contract, and that since the condition of the marriage failed the marriage itself was void. We find two difficulties with this position. The first is with its rationale that marriage is *at most* a civil contract, whereas we believe it is *at least* a civil contract, with status and the State's interest added to it. The second is that Judge Crichton assumed, even under the civil contract theory, that the parties intended no marriage, whereas that is precisely what they did; it was, as he said, to "be ostensible only, and for the sole purpose of giving a name to the child". The fact is that they intended the marriage to be ostensible as it concerned themselves but real as it concerned the child. Nothing short of a real marriage could give the child a name. We know of no authority permitting two persons to split up the incidents and obligations of marriage to suit themselves in this way, nor any, even in the civil law, which permits two people to enter into a contract for the "ostensible" purpose of affecting the rights of a third and having done so to recede from it at pleasure and without recourse. If the rules governing the rescission of civil contracts do not obtain in the annulment of a marriage contract (Eisenberg v.

Eisenberg, 105 Pa. Superior Ct. 30 (1932) ), still less is there any sanction for valid private reservations in entering upon marriage, or room for the forced analogy of failure of consideration because the expected child did not appear.

There is no flaw alleged in the formalities of the marriage before us. It was performed by a proper officer of the law after the issuance of a valid license, the young people were not insane or intoxicated or jesting, there is no allegation of fraud, coercion, or duress. They did in proper legal form precisely what they had intended and agreed to do, namely, to get married. What their private motives or reservations may have been is not enough to upset a marriage regular on its face, particularly when they intended it to be so for at least one purpose.

The fatal weakness of petitioner's position is that, while he and respondent considered only the child, the law considered them as potential parents and fastened that status upon them whether they wanted it or not. For all we know from the record, she may have been pregnant at the time of marriage and miscarried later. Surely the law does not regard the marriage status so tentative as to allow it to depend upon the outcome of any such condition. If it did it would have provided for rescission of the marriage contract at will by childless couples. The element which makes a marriage void is the natural or legal incapacity of the parties to contract it, not the private conditions which they choose to attach to it. Marriage is not as yet so private an affair. No incapacity appears here and they must stick to the bargain which they and the State made jointly.

That the law does not favor release for easy or sympathetic reasons, see Peifer v. Peifer, 113 Pa. Superior Ct. 271 (1934), and Santer v. Santer, 115 Pa. Superior Ct. 1 (1934), the latter concerning a miscegenetic marriage.

Counsel for petitioner has cited two cases from outside Pennsylvania in which relief was granted. Both of them include clearly distinguishing features. McClurg v. Terry, 21 N. J. Eq. 225, involved a marriage entered into in jest while on an outing. Dorgeloh v. Murtha, 92 Misc. 279, 156 N. Y. Supp. 181, involved elements of fraud and duress as well as the fact that a reluctant young girl under 16 was prevailed upon to go through a marriage ceremony simply in order to create a subterfuge by which she could get employment on the stage.

The master, in his careful report, has cited to the contrary Franklin v. Franklin, 154 Mass. 515, 28 N. E. 681 (citing Barnett et al. v. Kimmell, 35 Pa. 13), which was quoted with approval in Martin v. Otis et al., 233 Mass. 491, 124 N. E. 294, and in Brooke v. Brooke, 60 Md. 524. These cases we believe present the better doctrine.

It should be remarked in passing that release from marriage would be made easy if it were possible for the parties to assert successfully that they never intended to be really married in the first place. To let them out by annulment on such grounds would, through the bastardization of issue, have pernicious effects. We cannot believe that the legislature intended any such consequence. Indeed, the policy of the common law against allowing parents to bastardize their issue prevents us from holding that a marriage is void, in a case where a child has been born, upon the mere statement of the parties that they never intended really to marry. If we cannot give legal effect to the actual situation with regard to parentage, a fortiori we cannot give effect to what was in the parties' minds with regard to a marriage preceding the child's birth. The general language of the Act of 1935 cannot be interpreted to make such a radical change in the law.

We have examined the record of the debate on the Act of 1935, and while it is very brief it hints at what

appears more clearly, as an explanation of the act, in Freedman on Marriage and Divorce, p. 856; "Marital Status and Annulment in Pennsylvania", by J. John Lawler, 4 University of Pittsburgh Law Rev. 251, 271 (1938) ; and "The Annulment of Marriages in Pennsylvania", by F. Eugene Reader, 41 Dickinson Law Rev. 37 (1936). Prior to the act there was no relief for certain void marriages—those entered into in jest, or while one or both parties were insane, intoxicated or drugged, or by mistake, or by an adulterer with the co-respondent during libellant's lifetime, or by one below the age of marriageable consent. This difficulty appears in Pitcairn v. Pitcairn, 201 Pa. 368 (1902) (cited in the legislative debate), and in McCalmont v. McCalmont, 93 Pa. Superior Ct. 203 (1928). While our appellate courts have not as yet said so, we believe that the Act of 1935 was passed in order to afford relief in the type of case just mentioned. The sanction of public policy seems clear. We do not think, however, that there was either legislative intent or the sanction of public policy or law that a marriage like the one before us should be annulled.

We regard the point as of considerable importance. It is a coincidence that it has not reached our appellate courts before, and by the law of averages it probably would before long. To grant this annulment because of the sympathy we feel might do more harm than good, as the validity of this marriage might be called into question again years hence should the parties marry and property or other rights arise, and an intervening appellate decision against an annulment in such a case would play havoc with the situation. Were we to grant petitioner's prayer there would be no appeal. We hope petitioner will appeal our decision in order to settle the question.

The exceptions are dismissed, the report of the master is approved, and the petition is dismissed.