Santer, alias, *v.* Santer, alias, Appellant.

Argued May 1, 1934.

Before Trexler, P. J., Keller, Cunningham, Baldrige, Stadtfeld, Parker and James, JJ.

*Harland I. Casteel,* and with him *William Le Goullon,* for appellant.

*Alexander H. Schullman,* and with him *Harold H. Harter,* for appellee.

Opinion by Cunningham, J., October 3, 1934:

In this divorce proceeding the wife has appealed from a decree entered November 3, 1933, granting her husband a divorce upon the ground that she had procured the marriage by force and coercion. Additional grounds—cruel and barbarous treatment, indignities to the person and fraud—were set forth in the libel; but the court below correctly held there was no evidence of cruelty or indignities and that, for reasons

hereinafter stated, libellant could not avail himself of the charge of fraud.

By Section 10 (g) of "The Divorce Law" of May 2, 1929, P. L. 1237, it was enacted that it shall be lawful for the innocent and injured spouse to obtain a divorce from the bonds of matrimony whenever it shall be adjudged that the other spouse "shall have procured the marriage by fraud, force, or coercion, and which has not been subsequently confirmed by the acts of the injured and innocent spouse."

This provision of the codification of our laws relating to and regulating divorces is a reenactment of that portion of the Act of May 8, 1854, P. L. 644, which made fraud, force or coercion a ground for divorce. Force and coercion are, under the authorities, synonymous terms, and the only kind of force recognized as a ground for divorce is such force as would naturally raise in the mind a fear of bodily harm, or actual imprisonment. Before a decree can be sustained upon this ground, it must appear that the libellant consented to the ceremony by reason of such fear. It is essential that the threats relied upon be threats against life, or to do bodily harm, and such as would overpower the judgment and coerce the will; he has the burden of showing that he was in such a mental condition, as a result of the threats, that he did not, and could not, in reality, consent to the marriage: Todd v. Todd, 149 Pa. 60, 24 A. 128; Sturgeon on Divorce, 2d Ed., Sections 268-280.

Obviously, if the libellant has an opportunity to avail himself of such protection as the law affords one who is threatened, he is bound to do so; he must come into court with clean hands and a good cause. By the express terms of the act where there has been a subsequent confirmation of the marriage a libellant cannot avail himself of the ground here alleged.

As this case was tried by the court below without a

jury, it becomes our duty (Langeland v. Langeland, 108 Pa. Superior Ct. 375, 164 A. 816) to read and consider all the testimony and arrive at an independent judgment upon the merits.

The parties were married May 4, 1932, and the libel was filed some four months later. Libellant saw fit to rely upon his own testimony; no corroboration was attempted; its salient features follow: He is a Hebrew and twenty-five years of age. In March, 1932, (and for several years prior thereto) he was employed in a clerical capacity in the sample room and sales office of the Brown Shoe Company, located in the Hotel Henry, Pittsburgh, Pa.; his residence was No. 5720 Hobart Street in that city. Respondent, a Negress, aged twenty-nine, had been a chambermaid at the hotel for nine years, and, as a part of her daily duties, took care of this sample room. Libellant testified she frequently made improper advances to him, which he repelled until about April 15th of that year; that, upon that date, she was cleaning a bedroom, adjoining the office, and, under enticement by her, he had sexual intercourse with her in the bedroom; and that she then said, "You will make a nice husband for me," to which he replied, "That is impossible and ridiculous. I couldn't think of anything like that." His further statement was that respondent repeatedly demanded that he marry her, and, early in May, threatened that if he refused she would kill him and if she didn't her brother would.

Parenthetically, it may be stated in this connection that libellant sought to support the charge of fraud in the libel, by testifying that about a week after the intercourse respondent "came with a story she was pregnant ...... and I would have to marry her." Referring to the marriage, he stated, "after it was all over she said she had not been pregnant; she had just fooled me and now she had me." The charge that re-

spondent falsely claimed she was pregnant by him runs all through his testimony. As the court below properly held, libellant's assertion that he had sexual intercourse with respondent prior to their marriage effectually eliminated from the case any possibility of a decree upon the ground of fraud; Peifer v. Peifer, 113 Pa. Superior Ct. 271, 173 A. 437; Sturgeon on Divorce, Section 276.

As to the nature of the alleged threats, relied upon by libellant as amounting to force and coercion under the statute, he testified that the first was made by respondent's brother, Lafayette Burleigh, over the telephone, at which time he told libellant he was respondent's brother and said, ''What do you think you are doing? If you don't marry her I will shoot you.'' He also stated that about the end of April, Burleigh met him in front of the Hotel Henry and repeated the threat. An extract from his testimony, relative to an incident which he alleges occurred when he had gone to the North Side to see a customer, and on the way met Burleigh, reads: ''I approached the store, this fellow that stopped me the first time stood before me and he said, 'I thought you promised you would marry my sister.' I said, 'What do you want,' and he said, 'I am going to shoot you if you don't do this,' and he had a gun in his pocket the same as before, and he pushed me up to his home. Q. To whose home? A. To their home—his sister's home. Q. What happened when you got there? A. There they made me promise faithfully I would marry Ka Della. ...... This boy went up to me and he pointed the gun in my face, and he said, 'If you don't marry Ka Della you are going to be shot,' that is all there was to it: I was so frightened and scared I didn't know what to do.''

On May 3d libellant met respondent, by appointment, at the office of Alderman Abernathy, on the North Side of the city, to make application for a mar-

riage license. The only other person present was Harry Baumgratz, a constable working in that office. Describing the circumstances under which the application was made, libellant said, "I went over there and I didn't know what I was doing. I was half-crazy there, and she met me and we went through some questions and they took the answers down, and then we left there, and she said, I had better be sure to be back tomorrow to get the thing over with or else I would be shot for sure." The next day libellant met respondent several blocks away from the alderman's office about six o'clock in the evening and accompanied her to the office where the marriage ceremony was performed. His testimony, with respect to that event, reads: "I met her over at the same place and she was there and we went through some sort of questioning, I don't know what it was, I don't remember." His version is that she wanted him to go with her to her home, but he refused. His testimony continues: "Q. Why did you refuse to go home with her? A. I didn't even want to marry her: I was crazy. I was afraid they would kill me. Q. Why didn't you want to marry her? A. Because I simply didn't want to. I told her many times before she was colored and I was white, and I couldn't have anything to do with her."

Libellant continued his employment, seeing the respondent as usual at the hotel nearly every day, until the following October when he was discharged, as he says, because she told his employer of the marriage. He denies that he ever had intercourse with her after the marriage and avers that the only support he furnished was in obedience to an order of court which she obtained. A note which libellant offered in evidence, stating she had placed it upon his desk, evidently refers to this proceeding. It reads: "Sorry you are so stubborn. I have to have a warrant made out for you today, just because you won't act right.

I don't have to get some one else to do what you are supposed to, so Miss Grace [probation officer] is going to take care of you for me, so you can tell Mr. Subow [libellant's employer] you will have to be away because you will have to go with the officer when he comes. I am sorry but you won't listen."

There was evidence that respondent wrote a letter to libellant's mother, under date of September 25th, reading: "Please see that Sam returns my wedding band immediately as every wife is entitled to her ring. If I don't receive it this week I will be obliged to take steps I don't like to take, and I am sure Sam has had enough of trouble from his stubborness, so please see that he obliges me with the ring."

It may be observed in passing, that there is no evidence relative to the purchase or bestowal of the marriage token. The circumstances of extreme terror, to which libellant claims to have been subjected, do not seem to have prevented him from supplying the usual evidence of the existence of the marriage relation.

Libellant denies he was with respondent at her home except upon an occasion when he claims he was fraudulently induced to go there upon her representation that she "realized her mistake" and had arranged with an attorney to come to her home to "make arrangements for her divorce" and desired him to be present. Upon several other occasions he went there with his mother who, as he asserts, was trying to get respondent to quit "bothering" him.

Upon cross-examination, libellant admitted he never complained to the house detective at Hotel Henry or to any police officers about the threats, or made any effort of any kind to secure protection. When asked whether he had procured a Mr. Rosenberg "to go over and talk to the respondent and offer her $300 if she would permit [him] to get this divorce," his reply was that he had "nothing to do with it."

Respondent was the first witness in her own behalf and stated she had lived with her mother and brother at No. 16 Fountain Street, North Side, for about fifteen years. Her testimony was to the effect that she first met libellant in December, 1929, when he was working as a shoe clerk in one of the rooms under her charge; that her acquaintanceship with him grew into a courtship; that he took walks with her in the park; that he began calling on her at her home as early as July, 1930, and continued to "keep company" with her until the time of their marriage; and that he frequently brought her lunch to her at the hotel. An excerpt from her testimony reads: "Q. Who suggested getting married? A. He did. ...... He told me his employer was hard to get along with, and he said, ...... 'I expect to get a job away from here and you marry me, and I will take you to another place, if I get that new job.'" This alleged expectation of going away from Pittsburgh is respondent's explanation of the fact that they never lived together in a common home. Respondent denied positively that she ever had intercourse with libellant prior to their marriage. Her account of the application for the marriage license was that libellant asked her if she knew of any alderman and when she told him of Alderman Abernathy's office he suggested they go there. She testified that, pursuant to this arrangement, she met libellant at the end of the street car line and went with him to the alderman's office, where the constable asked each of them questions and filled out the application, and that she met libellant, by appointment, the following day at the same place. Her description of the ceremony reads: "Well, when we got in the squire met us and said, 'I see you are here,' and he said, 'Are you still the same boy that wants to get married,' and he looked at him and he said, 'Yes, you are smiling, you are the same boy,' and he said, 'All right,' and he asked him if he wanted any wit-

nesses, and he said, 'No,' then the constable stepped out and the squire continued with the ceremony.'' Her further statement was that libellant then went with her to her home and remained until about 9:30 when he left with the explanation that his brother was rooming with him and he did not want him to know of the marriage; that libellant came to her home two or three times each week; that they frequently had intercourse in her bedroom, but libellant neither stayed all night, nor ate meals, at her home. As to the alleged threats, she positively denied having made any herself; and testified that, to the best of her knowledge, her brother did not know libellant and had not made any threats of any kind against him. Referring to the first time libellant came with his mother to her home, respondent said libellant's mother, in the presence of respondent's mother, told them it was impossible for them to live together, that she would arrange with a lawyer for a divorce and would never let libellant live with her, but would see that he supported her. Upon another occasion, subsequent to the application for an order of support, she testified libellant's mother came alone with "the money for the week" and asked her to withdraw the application. Later she testified a Mr. Rosenberg came to see her, stating libellant had sent him; that Rosenberg said libellant's mother was his friend and had asked him to come to see respondent and, in the words of the witness, "see if I would accept a certain amount of money, and if I would take $50 down cash, and would I settle for $300, and if not, what would I settle for not to appear against him when he applied for a divorce." In substance, respondent's testimony was that libellant had appealed to her to let him obtain a divorce but that "he would come back and be the same"; that when his mother learned of his marriage she had had an attack of heart trouble and he wanted the divorce because "it would help her."

According to respondent, the last time libellant called at her home was on Columbus Day, 1932, when he asked her whether she had decided to give him a divorce, to which she replied, as formerly, that she had not married him to give him a divorce; that he had no grounds.

The testimony of the parties is irreconcilably conflicting; one of them has committed deliberate perjury in testifying about their relations before and since their marriage and with respect to the circumstances under which it took place. As stated, libellant made no effort to corroborate any part of his story; neither Rosenberg nor his mother was called; the statement was made that she was ill, but no effort was made to secure her deposition.

Respondent, in addition to calling her brother, mother and a neighbor, who, for present purposes, may be considered interested witnesses, called two apparently disinterested ones—the alderman and constable already mentioned.

Her brother stated he had never seen libellant until after the marriage and never had a gun; he categorically and specifically denied every statement made by libellant relative to interviews with and threats by him. Upon cross-examination, he explained that his sister showed him the certificate and told him libellant was getting a job out of town and they were keeping the marriage secret until they went away.

Respondent's mother testified libellant began coming to her home in July, 1930; that she did not know of the marriage until the evening of the day it occurred; and that libellant came to her home with respondent that evening. She corroborated the testimony of her daughter with respect to the frequent visits of libellant with her daughter before and after the wedding and relative to the visits and demands of

his mother. The neighbor, Mrs. Cutler, testified she had seen the parties walking together in the park as early as May, 1931; and that in August, 1932, while they were at the home of the witness, libellant appealed to her to persuade respondent to agree to a divorce for the sake of his mother.

There was testimony by libellant in rebuttal to the effect that respondent told him she had been married before to a white man and divorced in Columbus and that her grandmother was white. This testimony was contradicted by respondent and her mother.

When we turn to the testimony of the witnesses, who, so far as we can discover, have no interest in the result of the proceeding, we find Alderman Abernathy testifying he had not known either of the parties prior to the time they came to his office to secure the license and to be married. Referring to their first visit his testimony reads: ''Squire, state when the libellant came to your office to procure the marriage license in company with Ka Della Burleigh, what was his manner? A. All right—how do you mean? In what way? Q. Well, was he in a frightened condition? ...... A. No, he wasn't frightened. Q. What was his manner? A. Like anybody else that comes in. ...... Q. You knew he was white? A. I don't believe I would answer that question. I knowed he was white when I asked him. I think I asked him if he was sure. Q. You knew the girl he was marrying was colored? A. Oh, yes, sure. ...... Q. And as I understand you called the marriage license office? A. I called the marriage license and asked if it was lawful to marry a colored person and a white person. I thought there was some act possibly that they were not allowed to do it. Q. Did you speak to him and ask him if he knew what he was doing? A. Yes, sir—well, I think I said to him—I am pretty sure I did. I asked him if he knew what he

was doing, that is all. ...... Q. And was he excited?
A. No. Q. Nervous? A. No, I told you that before.
Q. Did he seem to you to be a man that was in fear or
put in fear? ...... A. No. I can answer that question
absolutely no."

As to the appearance of libellant at the time of the
ceremony on the following day, the witness said: "He
looked like any other man would, a man coming in.
He was very well satisfied and he went out, I can say.
He appeared to be very well satisfied with the lady he
was getting anyhow."

Baumgratz, the constable, testified that on the day
the license was applied for libellant came to the office
in the morning to inquire whether the "Squire married
people"; that respondent came first that evening and
libellant a few minutes later; and that the witness
filled out the application. An excerpt from his testi-
mony relative to libellant's manner reads: "Q. What
was his attitude and manner at the time he filled in this
application? A. He seemed to be jolly and smiled
about it. When I asked different questions he smiled,
all I can tell you. He didn't seem to be downhearted
about it." Later, and referring to the time of the
wedding, the witness testified: "Q. The day he was
married what was his condition? A. He seemed the
same to me that day as any other time. Q. Did he look
worried? A. I wouldn't say he did. He seemed to
have a smile on his face, didn't seem to be worried.
Q. Did he look frightened to you? A. No. Q. Did he
look to you as an individual who was out of his mind?
A. Well, I wouldn't answer that, I don't know. Q. Did
he answer your questions freely? A. He answered
questions. As I asked them he gave me the answers."
This witness also stated libellant paid him to keep
the license, etc. "out of the paper."

We have quoted perhaps at unnecessary length from

the testimony in this case because of its unusual and troublesome features and because, in the opinion of a majority of the members of this court, the application to the evidence of familiar principles and tests compels a conclusion opposed to that reached by the court below.

We agree with the statement in the opinion of the learned trial judge that it is difficult to give credence to respondent's statements to the effect that libellant "wooed her and professed love for her" and continued to have intercourse with her even after she had instituted non-support proceedings, but this testimony by her is not as incredible as his statements, at pages 45-47 of the record, relative to the details of the episode in the hotel bedroom. There is more here than a doubtful balance of the evidence. On the vital issue in the case, namely, whether the alleged threats of bodily harm so overpowered the judgment of libellant and coerced his will that he was, in the language of the court below, "no longer a free agent," we think the clear weight of the evidence is with the respondent. About the only disinterested testimony in the case is that of the alderman and constable and it negatives the libellant's description of his alleged condition when the license was applied for and the ceremony performed.

It is true, as stated by the court below, that the parties never took up a common residence and libellant never ate a meal in respondent's home, but such circumstances were present, in even a more pronounced degree, in the case of Todd v. Todd, supra, in which it was held that the libellant had not made out a case within the statute. We have already referred to respondent's explanation that they were trying to keep the marriage secret until they could leave the city. At most, these circumstances were more material to the

consideration of the question whether there had been a subsequent confirmation and probably justified the court below in finding there had not been such confirmation as is contemplated by the statute. Again, it seems to us that the conclusion of the court below overlooks, to some extent, the principle that when one threatened, as libellant claims he was threatened, has ample opportunity to do so, it is his duty to avail himself of such protection as the law affords.

Even if libellant's story be accepted at its face value, the natural inference would seem to be that the fear which operated upon his mind was not a fear of bodily injury but rather of being disgraced, in the eyes of his family and friends, by a prosecution for fornication with respondent, and that he conceived the plan of a secret marriage with her as a protection against such exposure. It is extremely difficult to accept the story of either party in its entirety, but that inference seems to us to be the one most fairly and naturally deducible from the evidence as a whole. The only marital obligation upon which respondent seems to have insisted was that of financial support. In his apparent eagerness to escape this responsibility, libellant laid so many grounds in his libel and testified so strongly in his efforts to sustain them that his story is not convincing. Exaggeration, in pleading or in testifying, naturally tends to deprive a cause of the strength it might otherwise have.

It is also true, as remarked by the court below, that the union was an unnatural one and was effected with great furtiveness. For instance, in making application for the license, and even in filing his libel and bill of particulars, libellant used the name "Wallace Sander" instead of his real name—Samuel W. Santer. His attempted explanation that he was frightened and irresponsible when he signed the application could not

possibly account for that signature on the libel and to the jurat. Such circumstances seem to be more indicative of deliberation and design than of haste and terror.

However deeply this marriage may be deplored from a sociological or ethnological point of view, miscegenation has not yet been made a ground for divorce in this state. In this and in every case we must close our eyes to any difference in social position, race or creed, which may exist between the parties, except in so far as such circumstances may assist in interpreting their testimony.

Upon consideration of the entire record, a majority of our members are of opinion that libellant has not established, by the required measure of proof, that he is entitled to a divorce upon any of the grounds set forth in his libel.

Decree reversed at costs of appellee and record remitted with instructions to dismiss the libel.