## Pusey v. Pusey

*E. J. Griffiths,* for libellant.
*D. F. Maxwell,* for respondent.

SMITH, P. J., November 19, 1947.—This matter comes before the court on exceptions filed by libellant to the report of the master dismissing his libel.

In paragraph 4 of the said libel, it is averred that said respondent did on or about April 11, 1944, procure the marriage of libellant by force and coercion, which marriage has not been subsequently confirmed by the acts of libellant, who is the injured and innocent spouse.

In the spring of 1943, libellant, a pharmacist's mate in the service of the marines, United States Navy, was stationed with his company in Melbourne, Australia. While at Camp Pell, Melbourne, he was introduced to respondent and from about January of 1943 until September of the same year, he stayed at the home of respondent's parents over night on several occasions and a number of weekends. In May (as respondent has testified) or in July of 1943 (as libellant admits) he discussed marriage with respondent and he and she went to see Father Fox, the priest at St. Patrick's Cathedral in Melbourne, to discuss their marriage. The priest informed libellant that he must first get the permission

from the United States authorities before he, the priest, could marry libellant and respondent. Libellant thereafter stated to respondent that he was waiting for such permission, and later informed her that he could not secure it. Libellant then left Melbourne, Australia, with his company on September 26, 1943, to go to New Guinea, New Britain and Cape Gloucester of the South Pacific Islands. In November 1943 he received a letter from respondent, advising him that she was pregnant and that he was the father of her unborn child. Libellant answered this letter, denying this accusation and stating that he would not marry her. Libellant testified that then he was ordered by his superior officer to board a plane and return to Melbourne; that two marines escorted him to the plane by which he returned to that city.

From this point on, the testimony is in conflict. Libellant testified that when he arrived at Melbourne and reported to his superior officer, he then went alone to the home of respondent and talked to her; that she informed him that she was in trouble and needed a husband, saying that she selected him because he was the likely one. He further testified that she stated that if he changed his mind, his captain would put him in jail and that he would get a dishonorable discharge from the service. He testified that after having seen respondent, he went back to his captain and then to a justice of the peace for the purpose of procuring a marriage license; that he then took the license to an Episcopal minister who married him and respondent on April 11, 1944. Libellant denied any sex relations with respondent at any time before or after the marriage. He later testified that respondent informed him that if he did not marry her, she would have him put in jail and that his reason for marrying her was that he did not want to be dishonorably discharged from the United States military service. He testified that he did not avail him-

self of any legal protection because he felt that if he went to court, he would lose his case. He testified that he went voluntarily to the home of respondent in May 1944; that he has contributed to her and the child's support since May of that year. He was asked whether or not, between the months of March and September of 1943, when he saw respondent quite frequently, he liked her well enough to marry her and he testified that he did, but he later saw his mistake.

The testimony of libellant is contradicted by the testimony taken in the depositions of respondent and her witnesses. Father Fox, the Catholic priest stationed at St. Patrick's Cathedral, Melbourne, testified that libellant and respondent came to him at his church in April or May of 1943 to arrange for a marriage between them, and he produced a memorandum he had made at the time, giving their names, dates of their births, parents' names and occupations, and residences. He testified that they wanted to be married at South Melbourne so he sent them to a parish priest in South Melbourne and he also advised libellant to get permission from his commanding officer.

Ernest Louis Renard Panelli, an Episcopal minister stationed at St. Luke's Church, Melbourne, testified that he performed the marriage ceremony on April 11, 1944; that libellant came alone to him and stated that he wanted to get married that day; that he then took libellant to a justice of the peace to obtain a marriage license; that the license was procured; that libellant obtained permission from his superior officer to get married, and that later that day, libellant brought respondent to his church where he married them. This minister testified that at the time of the interview, libellant did not indicate by word or deed any reluctance about getting married. The wife of this minister, who was a witness to this ceremony, testified that libellant showed no reluctance about getting married; that when

she wished him happiness, he thanked her and stated he thought they would be happy.

Ellen Emma Muth, who was a witness to the marriage, testified that libellant seemed to be smiling, was quite happy, at and after the ceremony.

Respondent, Florida Mary Pusey, testified that she was introduced to libellant in January 1943 by a mutual friend and that thereafter they became very friendly; that libellant used to stay weekends at her parents' home; that in May of 1943 he proposed marriage with her. Then it was that they went to see Father Fox for the purpose of arranging for a marriage. She testified that when libellant left Melbourne in September, he informed her that he would return soon to marry her, and that after he had gone to the South Pacific Islands, she found that she was pregnant. She testified that she wrote libellant every night and that when she found that she was pregnant, she so informed him. She testified that they had had intercourse several times while libellant was in Melbourne; that she then visited a physician who examined her and gave her a certificate showing that she was pregnant which she then took to Captain Condon of the United States marines after she had received a letter from libellant saying that he would not marry her. Respondent testified that when libellant returned to her home on April 8, 1944, she made no threat of any kind; that she did not advise him that the marines might put him in jail; that she did not threaten to put him in jail, and that she did not indicate that he would be dishonorably discharged. She testified that when he came back, he said he was sorry about her condition and that he wanted to get married right away.

The mother of respondent and her aunt, Mrs. Crawley, both testified that they were in respondent's home at the time libellant returned on April 8, 1944; that he was in good humor; that he kissed the mother of

respondent and her aunt, and then went up in the bedroom to see respondent who was at that time ill with influenza; that he said that he loved respondent and that he stated he had just come down for the purpose of getting married. The mother of respondent testified that after the marriage, libellant stated that he wanted to make provisions to take respondent back to the States; that he had never at any time said anything to suggest that he was not willing to marry her. The aunt, Mrs. Crawley, testified that she helped libellant in his marriage plans, and suggested that he go to see the priest at St. Patrick's Cathedral but libellant returned and stated that he would not get married in the Catholic faith because he would not take instructions; that they then discussed an Episcopal church and libellant stated that there was an Episcopal church nearby to the home of respondent where he would take her. Respondent, her mother, and her aunt, all testified that the evening of the marriage and the following night libellant and respondent slept together in the same bedroom.

The master found that there was no force or coercion used upon libellant to force him to enter this marriage. This finding by the master is supported by the testimony. Even accepting libellant's story as true, there is no evidence that respondent used any unfair or illegal means to produce the result. Where the charge is force and coercion bringing about the marriage, both parties are entitled to produce all evidence which would aid in establishing or rebutting that charge. The fact that these people were in love, which is evidenced by the fact that in May or July of the year 1943 they went to see a priest for the purpose of having him perform the marriage ceremony, is evidence showing the condition of mind of these parties. Libellant admits that this was so. When he went to the home of respondent in April of 1944, he may not have done so voluntarily because his

superior officer had informed him of the claim made against him and he was ordered to take a plane to return to that station. However, there is no evidence that he was escorted to respondent's home by any marines; there is no evidence that he was under arrest, and there is no evidence that any criminal charge had been made against him. There is no evidence that any force was used to compel this marriage.

In Todd v. Todd, 149 Pa. 60, 62, it is stated that any force used to compel the marriage " '. . . and in order to justify a divorce under the statute, upon the grounds of threats, they must be such threats against the life or to do bodily harm as would overpower the judgment and coerce the will. There must be such a mental condition, as a result of the threats, that the libellant did not and could not in reality consent to the marriage.' "

In Santer v. Santer, 115 Pa. Superior Ct. 1, 3, it is stated:

"Force and coercion are, under the authorities, synonymous terms, and the only kind of force recognized as a ground for divorce is such force as would naturally raise in the mind a fear of bodily harm, or actual imprisonment. Before a decree can be sustained upon this ground, it must appear that the libellant consented to the ceremony by reason of such fear. It is essential that the threats relied upon be threats against life, or to do bodily harm, and such as would overpower the judgment and coerce the will; he has the burden of showing that he was in such a mental condition, as a result of the threats, that he did not, and could not, in reality, consent to the marriage: Todd v. Todd, 149 Pa. 60, 24 A. 128; Sturgeon on Divorce, 2d ed., Sections 268-280."

As was stated in the opinion of Cunningham, J., in Santer v. Santer, supra, if libellant has an opportunity to avail himself of such protection as the law affords one who is threatened, he is bound to do so; he must come into court with clean hands and a good cause.

A preponderence of the evidence in this case would indicate that libellant does not come into court with clean hands. He has testified that he never had sexual relations with respondent before or after the marriage, yet he testified that there was a girl child born as the result of this marriage and that he has made an allotment for the maintenance and support of his wife and child. The testimony of respondent is to the effect that she and libellant had intercourse several times before the marriage and she, her mother and her aunt, have testified that after the marriage had been entered into by a religious ceremony, it was afterwards consumated by libellant and respondent. This the court believes to be true and all the probabilities point to that. There was no threat of bodily harm; there was no threat of death. It is stated in 9 R. C. L. § 74:

"There must be actual force by imprisonment or putting in fear or such threatening of life or of great bodily harm as amounts to duress per minas. It must also appear that the party's actions had been influenced by the acts complained of. Thus, threats to inflict bodily harm upon a person unless he marries another will not constitute duress where it does not appear that he was coerced thereby, but he entered into the marriage contract from other motives."

This young man was a marine. We do not believe for a moment that the marine commanding officer would compel a member of his unit to enter into a marriage if the young man convinced him that he was not responsible for respondent's condition. As was stated in Stevenson v. Stevenson, 7 Phila. 386, it is consistent with sound policy to assume that the intention of the complaining party is to right the wrong which he had committed, rather than to escape the punishment threatened.

A reading of this testimony which was before the court clearly indicates that a preponderence thereof

shows that this marriage was not procured by force or coercion, and for that reason the court approves the report of the master.

### Order

And now, to wit, November 19, 1947, the court approves the report of the master and dismisses the exceptions thereto.